UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MIAMI HERALD MEDIA COMPANY,
publisher of *The Miami Herald*,
MARY ELLEN KLAS, and
ELIZABETH KOH,

     Plaintiffs,

v.                                4:18cv392–WS/CAS

FLORIDA DEPARTMENT OF
TRANSPORTATION,

     Defendant.

_____

### ORDER DENYING PLAINTIFFS' MOTION TO REMAND AND GRANTING THE UNITED STATES'S MOTION TO QUASH STATE COURT PRODUCTION ORDER AND TO DISMISS AMENDED COMPLAINT

The Miami Herald Media Company, as publisher of *The Miami Herald*, and two of its journalists (collectively "Plaintiffs") initiated this action against the Florida Department of Transportation ("FDOT") in Leon County Circuit Court on May 2, 2018. Invoking Florida's public records laws, Plaintiffs sought to compel FDOT to produce certain records related to a bridge collapse that occurred in Miami-Dade County on March 15, 2018, killing and injuring a number of people.

Although not a party to the case, the United States of America, on behalf of the National Transportation Safety Board ("NTSB" or the "Board"), filed a Statement of Interest with the state court, explaining—among other things—that FDOT is temporarily prohibited by federal regulation and by NTSB directive from producing the records sought by Plaintiffs. On August 21, the state court ordered FDOT to produce the requested records, effectively overturning the NTSB's directive to FDOT not to disclose the requested investigative information.

On August 23, the United States of America ("United States" or the "Government") removed the action to this court, alleging that, "because Plaintiffs were indirectly challenging the NTSB's administrative decision, the NTSB is an indispensable party that, under state law, could not be joined because of sovereign immunity." ECF 2 ¶ 3. With its notice of removal, the United States filed an emergency motion to stay the state court's production order "pending ruling on forthcoming motion to quash." ECF 3. After hearing argument from the parties by telephone, the undersigned granted the Government's motion to stay. ECF 6. Plaintiffs have since filed a motion (ECF 8) to remand the action to state court, and the United States has filed a motion (ECF 7) to quash the state court's production order and to dismiss Plaintiffs' amended complaint. Plaintiffs and the United States have filed their respective responses (ECF 9 & ECF 12) and replies (ECF 15 &

12).

## I. BACKGROUND

### A.

The NTSB is "an independent establishment of the executive branch of United States Government," 49 U.S.C. § 1111(a), to which Congress granted broad authority to  "investigate . . . and establish the facts, circumstances, and cause or probable cause of" certain highway accidents  *Id.* § 1131(a)(1)(B). Absent a waiver, the NTSB enjoys federal sovereign immunity from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

On March 15, 2018, a pedestrian bridge linking Florida International University and the surrounding community collapsed, killing six people then in cars on the road beneath the bridge span. As required by 49 U.S.C. § 1131(a)(1)(B), the NTSB immediately initiated an investigation into the collapse.

The NTSB utilizes a "party" system to conduct investigations. ECF 2–30 ¶ 2 (Molloy Decl.). Under that system, the NTSB enlists the assistance of "those persons, Federal, state or local government agencies and organizations whose employees, functions, activities, or products were involved in the accident and that can provide suitable qualified technical personnel to actively assist in an investigation." 49 C.F.R. § 831.11(a)(1). The party system, which the NTSB has

successfully used in every investigation for decades, ensures that the NTSB has complete and accurate factual information for its investigations. ECF 2–30 ¶ 2 (Molloy Decl.). With fewer than twenty investigators and engineers employed by the NTSB's Office of Highway Safety, the NTSB relies heavily on the support and cooperation of its "parties." ECF 12–2 ¶¶ 3–4 (Second Molloy Decl.). Indeed, the party system is critical to the success of the NTSB's mission. *Id.*

Under the party system, the NTSB leads the investigation and directs the actions of party members. ECF 12–2 ¶ 5 (Second Molloy Decl.). In essence, the NTSB "deputizes" party members to assist in the investigation under the supervision of NTSB staff investigators. *Id.* Party members to an investigation are required by federal regulation to "follow all directions and instructions from NTSB representatives." 49 C.F.R. § 831.11(a)(4). Among other things, the NTSB has regulatory authority to require parties to submit documents and other evidence relevant to the investigation. ECF 12–2 ¶ 5.

FDOT was designated as a "party" to the bridge investigation just two days after the collapse occurred. ECF 12–3 ¶ 3 (Drummond Decl.) The investigator in charge ("IIC") of the investigation instructed FDOT to keep confidential all records collected by the NTSB as part of the NTSB's investigation, including records submitted by FDOT. *Id. ¶* 4. By regulation, 49 C.F.R. § 831.11(d), FDOT was

required to certify—and did certify—that the agency and its employees would comply with all NTSB directives. ECF 2–8, Ex. 7.

Congress authorized the NTSB to prescribe regulations necessary to the exercise of its investigative functions. 49 U.S.C. § 1113(f). Among such regulations is one that concerns the "[p]rovision and dissemination of investigative information." 49 C.F.R. § 831.13. Subsection (c) of § 831.13 prohibits parties to an investigation from "releasing *information obtained during an investigation* at any time prior to the NTSB's public release of information" unless certain criteria not relevant here are met. *Id.* § 831.13(c) (emphasis added). The restrictions on release of investigative information are designed to ensure that NTSB investigations proceed expeditiously without interference or competing interests driving the focus of the parties. ECF 2–30 ¶ 5. (Molloy Decl.).[1]

The term "information" for purposes of § 831.13 is defined as:

(1) Information related to the accident or incident;

---

[1] By letter dated May 3, 2018, NTSB's Assistant General Counsel advised that: "It is important to note that in addition to the ongoing NTSB investigation, the bridge collapse is also the subject of multiple other ongoing investigations. Specifically, there are federal criminal investigations being conducted by at least two federal agencies, as well as several federal regulatory investigations, and a criminal investigation being conducted by the Miami Dade police department. *All of the investigating agencies are parties to the NTSB investigation and have significant interest in not having investigative information publicly released at this time*." ECF 2–23 at 1 (emphasis added).

(2) Any information collected or compiled by the NTSB as part of its investigation, such as photographs, visual representations of factual data, physical evidence from the scene of the accident, interview statements, wreckage documentation, flight data and cockpit voice recorder information, and surveillance video; and

(3) Any information regarding the status of an investigation, or activities conducted as part of the investigation.

§ 831.13(a). Except where the NTSB authorizes a party to retain information, a party to the investigation must promptly provide to the NTSB "[a]ll information described in § 831.13(a)" obtained by that party. § 831.13(b). Consistent with § 831.13, the NTSB directed FDOT to turn over departmental records related to the bridge collapse and to not disclose those records to third parties unless approved by the NTSB's IIC.

The NTSB recently addressed the rule set forth in § 831.13 when, in 2017, it promulgated a final revised rule regarding the provision and dissemination of investigative information. *See* Investigation Procedures, 82 Fed. Reg. 29670–01, 2017 WL 2797254 (June 29, 2017). Among other things, the NTSB explained:

[W]e need to remain the sole disseminator of [investigative information as defined in § 831.13(a)]. We remain concerned that a premature release of information during an investigation could result in the release of incorrect or incomplete information requiring additional effort to correct, possibly impeding the progress of an investigation, and eroding public confidence in the credibility of an investigation.

*Id.* at 29681–29682. The NTSB expressly rejected one commenter's suggestion that

the NTSB narrow its definition of investigative information to provide that

"[p]arties are allowed to release records and documents that existed before the

NTSB commenced its investigation." *Id.* at 29682. The NTSB explained its

rejection of the commenter's suggestion as follows:

> In defining investigat[ive] information, the NTSB is not limiting the
> scope of information the agency may obtain or consider under its
> statutory authority. The NTSB has broad authority to require the
> production of evidence it deems necessary for the investigation. 49
> U.S.C. 1113(a)(1). The regulatory definition of investigative
> information limits the scope of information that may be released
> outside the investigation. The scope of investigative information
> depends on the nature of the accident or incident. An accident may be
> the result of a series of events or actions, and is not defined exclusively
> by the time of impact. For example, if the NTSB is conducting a
> limited investigation, the investigative information may be limited to
> information created or originating immediately prior to impact. If the
> NTSB, however, is conducting a major investigation in which it is
> examining potential causes of the accident that include a number of
> complex safety issues, investigative information could include
> documents and data leading up to the accident. Crewmember training
> records and maintenance records may be critical to such an
> investigation, even though they pre-date the accident or incident.
> Determining the probable cause of an accident or incident, in lieu of
> simply describing what happened, expands what the NTSB considers
> investigative information. The NTSB has determined the definition of
> investigative information must therefore be flexible.

*Id.*; *see also* ECF 2–30 ¶ 4 (Molloy Decl.) (explaining that "[i]nvestigative

information can be anything relevant to the NTSB investigation, regardless of when

the information was developed").

With regard to the Miami-Dade bridge collapse, the NTSB initially restricted

release of all information related to the bridge without any date limitation. ECF

2–30 ¶ 8 (Molloy Decl.). Because the bridge was newly designed and built, the

NTSB did not know during the initial stages of the investigation what factors may

have led to the bridge collapse. *Id.* As a result, "all information related to the

design, construction techniques, materials used and the process of moving the

bridge into position was potentially relevant and critically important to the

investigation." *Id.*

　　Normal NTSB procedure is to restrict release of investigative information

until late in the investigation to ensure the integrity of the evidence received and to

keep the parties focused on assisting the investigation. ECF 12–2 ¶ 8 (Second

Molloy Decl.). Given the intense public and media interest in the bridge collapse,

the NTSB decided that it was "important to provide the public with as much

information as possible while ensuring the integrity of [the] ongoing investigation."

ECF 2–30 ¶ 9 (Molloy Decl.). The NTSB determined that parties, including FDOT,

could release information that existed up to and including February 19, 2018, but

not information that existed on February 20 or after. *Id.* The NTSB communicated

the revised restrictions to all parties to the investigation, including FDOT. *Id.* The

NTSB also advised all parties that any outside requests they received for

information that existed on February 20 or after would have to be submitted to the

NTSB for approval. *Id.* ¶ 10. As directed by the NTSB, "FDOT has continually produced documents to the NTSB, including all outside requests for documents post-February 19, 2018, for NTSB review and approval." ECF 12–2 ¶ 8. This process "has been a significant effort for FDOT and the NTSB which has distracted from the investigation." *Id.*

## B.

Between March 17 and 23, 2018, just days after the pedestrian bridge collapse in Miami-Dade County, Plaintiffs delivered requests for public records concerning the bridge to FDOT and its general counsel. Am. Compl., ECF 2–8 ¶ 8. In response to Plaintiffs' requests, FDOT produced responsive documents dated February 19, 2018, and earlier, but refused to produce responsive documents from February 20, 2018, and later. *Id.* ¶¶ 11–12. On May 2, 2018, invoking the Florida Constitution and Florida Statutes § 199.11, Plaintiffs filed this lawsuit in state court seeking an order requiring FDOT to produce responsive documents that existed on or after February 20, 2018, documents that all parties agree constitute "public records" under Florida law.[2] Plaintiffs alleged that:

---

[2] During the phone hearing shortly after removal, counsel for the Government stated that the NTSB does not contend that the records sought are not public records under the relevant state statute, only that they are not discoverable *at this time*.

FDOT's reliance upon [§ 831.13(c)] as a basis for withholding every public record from February 20 and later is misplaced because records that FDOT made and received in connection with the transaction of its official business *before* the bridge collapsed on March 15—and *before* FDOT became, on March 17, a "party" to the NTSB's investigation of the collapse—were not obtained by FDOT during an investigation.

*Id.* ¶ 15.

In a letter sent to the state court on May 3, the day after Plaintiffs filed their lawsuit, NTSB's assistant general counsel explained, among other things, the following:

The February 19, 2018 cutoff date is not arbitrary; we conducted an initial review of the evidence and determined that while the earlier information is important, it is not as critical to the investigation as information after that date.
. . . .

In a complicated investigation such as this, cooperation from witnesses and others involved in the design, construction and installation of the bridge is critical. If investigative information is released prematurely, it can lead to witnesses refusing to talk to us, changing their stories, or potentially destroying evidence. We have also found that premature public disclosure results in reduced cooperation by the parties to our investigation because suddenly they are focused on public relations concerns and responding to often erroneous information in the press, rather than diligently assisting our investigation to understand the causes of the accident.

ECF 2–12, Attach. A. A second letter to the court from NTSB's assistant general counsel, dated June 1, 2018, explained that "[t]he erroneous interpretation that a party to an NTSB investigation is free to release any information it possessed before

the accident is contrary to the express language of the regulation and relevant

rulemaking history, and as explained below, would negate the entire purpose of the

regulation." ECF 8–1, Ex. 1 at 1. The June 1 letter further explained:

> If . . . the regulation [§ 831.13] permitted each party to release all
> relevant factual information in its own possession prior to the accident
> (i.e. information not originally obtained <u>during</u> an investigation), the
> overall purpose for the regulation would be lost. Each party could
> release its portion of the information, and the resulting combination of
> information from all parties, collectively, would be the entirety of the
> investigative information the regulation is designed to protect. A media
> outlet or any member of the public, unable to obtain all the information
> from a single source, would merely have to obtain discrete portions of
> the information from multiple sources, then reassemble the portions
> into a complete whole. It would be nothing more than an exercise in
> collating stacks of information, and the bulk of the NTSB's
> investigation file would be laid bare prematurely. This is precisely the
> outcome 49 C.F.R. § 831.13 prohibits.

*Id.* at 3.

Soon after the case was filed in state court, FDOT moved to dismiss the

complaint for failure to join an indispensable party. In the words of FDOT:

"Because the heart of this case turns on the NTSB's federal statutory authority to

control the flow of information related to the FIU Bridge Incident," and because

"the interests of the NTSB would be affected by any action this Court takes," the

NTSB is an indispensable party to the litigation, without whose joinder the case

must be dismissed. ECF 2–11 at 2, 4. FDOT also moved to dismiss the case for

failure to state a claim, asserting that federal law, which purportedly prohibits

disclosure of the responsive documents, preempts Florida's public records law, to the extent the state law mandates disclosure of investigative information collected by the NTSB before the NTSB authorizes release of the documents. ECF 2–10. Finally, FDOT asked the state court to take judicial notice of the general counsel's May 3 letter regarding NTSB's interpretation of § 831.13, arguing that the letter constituted an official action of the NTSB.[3] ECF 2–12. Plaintiffs opposed all three motions. ECF 2–14, 2–15, & 2–16.

On June 4, 2018, at a hearing on FDOT's motions, the state court judge then assigned to the case[4] said: "I think NTSB is an indispensable party." ECF 7–1 at 5. After acknowledging that he had not "researched" or "thought through" the "sovereign immunity issues," the judge said:

> I need some indication from NTSB if we're just chasing this indispensable party issue, if it's just a rabbit trail we're running down, or do they really want to be involved on a formal basis. It they don't want to be involved on a formal basis, then we will proceed on with the arguments like we would any other case.

*Id.* at 6. The judge asked for some input from the NTSB by June 18, 2018. *Id.* The

---

[3] Under § 90.202(5), Florida Statutes, a Florida court may take judicial notice of "[o]fficial actions of the legislative, executive, and judicial departments of the United States."

[4] The judge who initially presided over the case rotated out of the civil division at the end of June 2018, at which time the case was reassigned to another judge. Under the case assignment protocol in the state court, judges are periodically rotated among the court's several divisions.

United States thereafter notified the state court that it was considering whether to file a Statement of Interest as allowed by 28 U.S.C. § 517. ECF 2–24, 2–27, 2–28. That statute authorizes the Attorney General of the United States to send any officer of the Department of Justice "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." On July 30, 2018, the United States filed a § 517 Statement of Interest in support of FDOT's motions to dismiss. Such a Statement of Interest is a "means of communication from the executive branch to the judicial branch giving notice that the litigation adversely impacts upon the . . . policy interests of the United States so that the Court may take that circumstance into account if it becomes relevant to any legal arguments advanced by the Defendants in seeking a dismissal." *Creedle v. Ginenez*, No. 1:17–22477-KMW, 2017 WL 5159602, at *2 (S.D. Fla. Nov. 7, 2017). The United States need not be a party in a case to assert its interests under § 517. *Id.* Moreover, the United States neither waives its sovereign immunity nor becomes a party to the case by so asserting its interests. *See, e.g.*, *Two Shields v. Wilkinson*, 790 F.3d 791, 799 (8th Cir. 2015) (recognizing that the United States, a non-party, did not waive its sovereign immunity, nor was it required to intervene as a party, even though it was permitted to assert its interests in the case through an *amicus* brief).

On July 31, 2018, again at a hearing on FDOT's motions, counsel presented their arguments to a different state court judge. The focus of these arguments was on five words in the first sentence in § 831.13(c), namely, "information obtained during an investigation." Counsel for Plaintiffs contended that subsection (c)'s release prohibition applies to "information obtained [*by FDOT*] during an investigation." According to Plaintiffs' counsel, § 831.13(c) does not apply to records that pre-dated FDOT's designation as a "party" to the NTSB investigation because those records were not obtained by FDOT during an investigation. In contrast, counsel for FDOT asserted that subsection (c)'s prohibition applies to "information obtained [*by the NTSB*] during an investigation." Because the records in question were obtained by the NTSB during its investigation, FDOT's counsel argued that the release prohibition set forth in § 831.13(c) applies to the records sought by Plaintiffs, obliging FDOT to withhold the records until the NTSB authorizes their release notwithstanding the state public records law. Echoing FDOT's arguments, counsel for the United States stressed that, if the regulation is viewed as a whole, as it should be, it is clear that the word "information" as used in subsection (c) encompasses all three categories of information defined in subsection (a), including "[a]ny information collected or compiled by the NTSB as part of its investigation." Counsel for the United States also urged the court to defer to the

NTSB's interpretation of the regulation as set out during the NSTB's 2017 rulemaking process.

While acknowledging that the parties interpreted § 831.13(c) in opposing ways, the state court judge found that (1) there was no reason to defer to the NTSB's interpretation of § 831.13(c) because the regulation unambiguously supports Plaintiffs' interpretation; and (2) the requested records do not constitute "information obtained during an investigation" and, therefore, § 831.13(c) does not apply, making inapplicable the doctrine of federal preemption. In an order dated August 21, 2018, the state court denied FDOT's motion to dismiss for failure to state a claim, denied FDOT's motion to dismiss for failure to name an indispensable party as moot, and directed FDOT to produce to Plaintiffs the requested records from February 20 to March 15. Doc. 2–31. The United States removed the case to this court two days later.

## II. PLAINTIFFS' MOTION TO REMAND

### A.

The United States removed the action to this court pursuant to 28 U.S.C. § 1442(a)(1), which authorizes the removal of any "civil action" that was "commenced in a State court" and that is "against or directed to" the United States or to any agency or officer thereof "for or relating to any act under color of such

office." As used in  § 1442(a)(1), the term "civil action" means "any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is sought or issued." § 1442(d)(1). The term "agency" includes an "independent establishment" of the United States. 28 U.S.C. § 451.

Although the text of the statute does not so state, some federal courts have held that the removing agency or officer must be able to allege a colorable federal defense to the action. *See*, *e.g.*, *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) (explaining that "proper removal" under § 1442(a)(1) requires allegations of a "colorable defense arising out of [a] duty to enforce federal law" (internal quotation marks omitted)). *But see City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 389–92 (6th Cir. 2007) (holding that, because the requirement of a colorable federal defense is tied to the words "under color of office," federal agencies need not provide a colorable federal defense because "under color of office" applies only to federal officers or agents); *City of Jacksonville v. Dep't of Navy*, 348 F.3d 1307, 1313 n.2 (11th Cir. 2003) (recognizing that "it remains to be decided whether the requirement of a federal defense also applies to removal by the United States or one of its agencies" but declining to decide because the removing entity asserted the federal defense of

sovereign immunity). Sovereign immunity and federal preemption constitute "colorable federal defenses" for purposes of removal under § 1442(a)(1). *See id.* at 1313 (stating that the legislative history of § 1442(a)(1) makes "clear that Congress intended to make it possible for federal courts to resolve issues like sovereign immunity"); *see also* H.R. Rep. No. 104–798, at 20 (1996) (recognizing, when enacting the 1996 amendments to § 1442(a)(1), that sovereign immunity and federal preemption are "important and complex" federal defenses that federal agencies and officers should be able to assert in federal court).

Section § 1442(a)(1), often referred to as the federal officer removal statute, is intended "to protect the Federal Government from [state] interference with its 'operations.' " *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007)); *see also Murray v. Murray*, 621 F.2d 103, 106 (5th Cir. 1980) (noting that, when enacting § 1442(a)(1), Congress recognized that "the interest of national supremacy requires the protection of a federal forum in those actions commenced in state court that could arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials"). The statute independently provides the federal court with jurisdiction that is derivative of the state court from which the case was removed. *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). If the state court lacked jurisdiction over the subject matter or the parties, the federal court to which the case

was removed also lacks jurisdiction. *Minnesota v. United States*, 305 U.S. 382, 389

(1939).

In *Willingham v. Morgan*, 395 U.S. 402  (1969), the Supreme Court directed

courts to broadly interpret § 1442(a)(1) so as not to frustrate the statute's purpose.

*Id.* at 407. In the Court's words:

> Federal jurisdiction [under § 1442(a)(1)] rests on a federal interest in
> the matter, the very basic interest in the enforcement of federal law
> through federal officials.
>
> . . . [§ 1442(a)(1)] is not narrow or limited. At the very least, it is
> broad enough to cover all cases where federal officers can raise a
> colorable defense arising out of their duty to enforce federal law. One
> of the primary purposes of the removal statute—as its history clearly
> demonstrates—was to have such defenses litigated in the federal
> courts. . . . Congress has decided that federal officers, and indeed the
> Federal Government itself, require the protection of a federal forum.
> This policy should not be frustrated by a narrow, grudging
> interpretation of s 1442(a)(1).

*Id.* at 406–07; *see also In re Commonwealth's Motion to Appoint Counsel Against*

*or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466–67 (3d Cir. 2015) (noting

that "[u]nlike the general removal statute, the federal officer removal statute is to be

'broadly construed' in favor of a federal forum"). The statute is to be interpreted "to

provide the government with [a] federal forum when a ruling of significant potential

federal impact is at stake." *Smith v. Housing Auth. of Baltimore City*, No.

1:10cv1806, 2011 WL 232006, at *2 (D. Md. Jan. 24, 2011) (quotation marks and

alteration omitted).

In its notice of removal, the United States asserts that "the state court ordered FDOT to produce the investigative information in question to Plaintiffs, effectively overturning the NTSB's directive not to disclose that investigative information." ECF 2 ¶ 5. The United States also asserts in its notice that (1) "[t]he NTSB is an independent establishment of the United States Government entitled to sovereign immunity"; (2) the NTSB "is an indispensable party that, under state law, could not be joined because of sovereign immunity"; and (3) FDOT asserted that it was properly declining to produce the records under preemptive federal law." *Id.* The United States filed its notice of removal two days after the state court's order was entered.

B.

Plaintiffs have moved to remand the action to state court. ECF 8. Among other things, Plaintiffs contend that removal under § 1442(a)(1) is improper because the action is not "against or directed to" the NTSB. The court is not persuaded.

The Supreme Court has said that a suit is "against" the sovereign if " 'the judgment sought would expend itself on the public treasury or domain, or *interfere with the public administration*.' " *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (quoting *Land v. Dollar*, 330 U.S. 731, 738 (1947) (emphasis added)). "As to what

na

is to be deemed a suit against a [sovereign], . . .  it is now established that the question is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record." *In re State of New York*, 256 U.S. 490, 500 (1921).

Congress gave the NTSB primary investigative authority over the accident at issue, with the concomitant authority to protect the integrity of its investigative operations and to exercise control over those operations through the promulgation of regulations. 49 U.S.C. § 1131. The NTSB promulgated such regulations, and the NTSB's interpretation of those regulations is entitled to deference.[5] Among the regulations promulgated by the NTSB is 49 C.F.R. § 831.13. Consistent with its published interpretation of § 831.13(c), *see* 82 Fed. Reg. 29670–01 at 29682, the NTSB directed FDOT to turn over departmental records related to the bridge collapse and to not disclose the information contained in those records until the NTSB publicly released the information. As a party to the NTSB investigation, FDOT—by agreement and by regulation—is accountable to the NTSB and acts at the direction of the NTSB.

In their lawsuit, Plaintiffs sought and received an order from the state court

---

[5] *See Tokoph v. Blakey*, 73 F. App'x 772, 773 (5th Cir. 2003) (noting that the NTSB's interpretation of the statutes and regulations it administers is entitled to "substantial deference").

directing FDOT to produce certain documents, effectively overturning the NTSB's

non-disclosure directive, thus interfering with the administration of the national

government by undermining the NTSB's authority to control its investigative

operations, including the authority to control the timing of the release of

investigative information. While Plaintiffs have attempted to ignore the very real

and substantial interest of the United States by framing their lawsuit as a public

records case against FDOT, the court finds that Plaintiffs' lawsuit is indeed "against

or directed to" the NTSB. As asserted by the Government, ECF 12 at 45, the United

States is a real party in interest in the case at bar.

Of the many cases that address the officer removal statute, three are

particularly instructive here. First, in *Clio Convalescent Center v. Michigan*

*Department of Consumer & Industry Services*, 66 F. Supp. 2d 875 (E.D. Mich.

1999), a nursing home ("Clio") filed a complaint in state court against a state

agency that had entered into an agreement with the federal Secretary of Health and

Human Services (the "Secretary") to ensure compliance with Medicaid's nursing-

home certification requirements. The agreement specified that the state acts on

behalf of the Secretary and is "the real party in interest in administering the program

established by the Act." *Id.* at 876. Before the suit was filed, pursuant to its

agreement with the Secretary, the state agency had conducted a survey of Clio,

found violations of a federal regulation, and was planning to recommend that civil

penalties be imposed against Clio by the Health Care Financing Agency ("HCFA").

*Id.* In its complaint, Clio alleged that, when determining what remedies to

recommend to HCFA, the state agency implemented policies that it had not

promulgated pursuant to a state administrative procedures act. *Id.* After the state

court issued an injunction preventing the state agency from taking any action with

respect to its survey, including forwarding its remedy recommendation to the

HCFA, the Secretary removed the action to federal court pursuant to § 1442(a)(1).

*Id.*

The federal district court in *Clio* determined that the Secretary, although not

named as a defendant, was the real party in interest in administering the federal

Medicaid-compliance program. *Id.* at 876–77. The district court explained that,

"[b]ecause the [state agency] was implementing federal regulations pursuant to its

obligation under statutes, regulations, and/or contract, it was acting as HCFA's

agent," making proper the Secretary's removal under § 1442(a)(1). *Id.* at 877. The

district court granted the Secretary's motion to dissolve the injunction and granted

the Secretary's motion to intervene, albeit while commenting: "As [the state

agency] was acting as the Secretary's agent, the Secretary is the real party in interest

and therefore, does not have to formally intervene." *Id.*

In another case, *In re Lusk*, No. 8:16–930–AG, 2016 WL 4107671 (C.D. Cal.

July 30, 2016), the petitioner ("Stirling") filed an application with a California state

court, alleging that the respondent ("Lusk"), a military lawyer serving in the

California National Guard and licensed in another state, was engaged in the

unauthorized practice of law in California. *Id.* at *2. Consistent with California law,

Stirling sought an order directing Lusk to show cause why the state court should not

"assume jurisdiction" over Lusk's law practice. After appearing at a hearing before

the state court, Lusk and the United States—a non-party—removed the case to

federal court pursuant to the federal officer removal statute. *Id.* Stirling filed a

motion to remand, and Lusk moved to dismiss the action.

The federal district court denied Stirling's motion to remand, finding that

Stirling's lawsuit was "directed to" the United States and its military operation. *Id.*

at *3. The court explained that it need not resolve whether Lusk qualified as a

federal officer because "the United States is a real party in interest that has a right to

a federal forum." *Id.* Referencing the general rule that "a suit is against the

sovereign if the judgment sought would expend itself on the public treasury or

domain, or interfere with the public administration," *Dugan*, 372 U.S. at 620, the

district court explained:

> The Application here seeks to seize a law practice of a federally
> certified JAG. Such an action may interfere with the United States'

> operation of its federal JAG program, which currently only requires
> trial or defense counsel practicing in military courts martial to be
> members of any state bar. As such, the Application is effectively
> "directed to" the United States and its military operation regarding the
> licensure requirements for its attorneys practicing in military courts
> martial. And because the United States has a right to a federal forum, it
> properly removed the Application to this court under Section
> 1442(a)(1).

2016 WL 4107671, *3 (citation omitted). After concluding that the United States

and Lusk both enjoyed immunity from suit under the *Feres* doctrine, *Feres v.*

*United States*, 340 U.S. 135 (1950), the court granted Lusk's motion to dismiss

without leave to amend. *Id.* at *5–6.

In yet another case, *Law Office of Mark Kotlarsky Pension Plan v. Hillman*,

No. 8:14cv3028–TDC, 2015 WL 5021399 (D. Md. Aug. 21, 2015), the plaintiff

("Kotlarsky") obtained a state court money judgment against a number of

defendants, including a medical center, in 2009. *Id.* at *1. In April 2010, unable to

collect from the defendants, Kotlarsky obtained a writ of garnishment directed to a

Medicare Administrative Contractor ("MAC"). *Id.* The writ ordered the MAC to

pay Kotlarsky all the money the MAC owed to the medical center. *Id.* The MAC

never responded to the writ. Roughly four years later, in March 2014, the MAC

received service of a *subpoena duces tecum*, directing the MAC to provide

Kotlarsky with all checks and other documents relating to payments made by the

MAC to the medical center during a given time period. *Id.* When the MAC declined

to release any such records, Kotlarsky filed a motion to compel the production of documents, which was granted by the state court in June 2014. *Id.* at *2. In July 2014, Kotlarsky moved for summary judgment against the MAC. *Id.* The state court granted Kotlarsky's summary judgment motion on August 19, 2014, in the amount of $18,748.75. *Id.* A month later, on September 25, 2014, the United States—a non-party—removed the garnishment action to federal court under § 1442(a)(1) and filed a motion to vacate the state court's judgment for lack of subject matter jurisdiction. Kotlarsky filed a motion to remand the action to state court. *Id.*

Citing *Dugan*, 372 U.S. at 620 ("[A] suit is against the sovereign if the judgment sought would expend itself on the public treasury."), the *Kotlarsky* court determined that the United States was a real party in interest in the garnishment action and, as such, was entitled to remove the action under the federal officer removal statute. *Id.* at *3. While noting that—ideally—the Government would formally enter a case against a private contractor serving as a MAC, "either through a motion for joinder by the MAC or a motion to intervene," "such action is not necessary for the Government to be considered the real party of interest." *Id.* Because the case implicated federal Medicare funds, the district found that the garnishment action was "directed to" the "United States or any agency thereof." *Id.*

The district court in *Kotlarsky* acknowledged that the government filed its

notice of removal over four years after the MAC was served with the original writ of garnishment but, nonetheless, denied Kotlarsky's motion to remand "because the issues before this Court on removal implicate the federal government's sovereign immunity." *Id.* at *4. The district court also rejected Kotlarsky's argument that removal was improper because the state court's summary judgment was a final order from which the MAC did not file a timely appeal. *Id.* at *5. In the district court's words:

> The fact that the state court had entered final judgment does not preclude removal under 28 U.S.C. § 1442. . . . In a case removed after judgment, the district court adopts the state court judgment and may review it as it would review its own, "follow[ing] the ordinary rules regarding post-judgment remedies." *Resolution Trust Corp. v. Allen*, 16 F.3d 568, 573 (4th Cir. 1994). A district court may relieve a party from a final judgment on various grounds under Rule 60(b), including where "the judgment is void" or for "any other reason that justifies relief."

*Id.* The district court concluded not only that "the doctrine of sovereign immunity barred the state court from ordering a judgment against federal funds." *Id.* The district court accordingly granted the United States's motion for relief from final judgment, declared the state court's summary judgment void, and—as required under the federal court's derivative jurisdiction—dismissed the garnishment action. *Id.* at * 7.

In addition to arguing that their action is not "against or directed to" the

NTSB, Plaintiffs in this case maintain that the United States failed to timely remove the case. Among other things, Plaintiffs contend that the United States was required under 28 U.S.C. § 1446(b) to remove the action within thirty days of the day it first received notice of the lawsuit, something it failed to do. Under § 1446(b), a *defendant* must remove a civil action from state court to federal court "within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C. § 1446(b)(1). Section 1446(b) does not address removal by a non-party to the case. Furthermore, "the time-window in § 1446(b) 'is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, 'through service or otherwise,' after and apart from service of the summons, but not by mere receipt of the complaint unattended by any formal service.' " *Hooker v. Sec'y, Dep't of Veterans Affairs*, 599 F. App'x 857, 860 (11th Cir. 2014) (quoting *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 348 (1999)); *see also Dernis v. Amos Fin.*, 701 F. App'x 449, 452–53 (6th Cir. 2017) (citing the Supreme Court's decision in *Murphy Bros., Inc.*, to support the court's conclusion that the thirty-day removal period under §§ 1442(a)(1) and 1446(b) began when the federal agency—a defendant in the case—received formal service of process consistent with the requirements of Michigan's rules of civil

procedure). Plaintiffs' suggestion that the thirty-day time period set forth in §

1446(b) was triggered by NTSB's receipt of informal notice about the lawsuit is

misplaced. *See* ECF 8 at 11.

The United States contends that its removal was timely under 28 U.S.C. §

1446(g), a provision that applies only to proceedings that are removable under §

1442(a). Under § 1446(g), a "civil action" in which a "judicial order for testimony

or documents is sought or issued or sought to be enforced" is removable under §

1442(a) "if the person or entity desiring to remove the proceeding files the notice of

removal not later than 30 days after receiving, through service, notice of any such

proceeding." 28 U.S.C. § 1446(g). This section has been interpreted to mean that a

§ 1442(a) proceeding may be removed at multiple junctures—namely when a

"judicial order for testimony or documents" is "sought" or "issued" or "sought to be

enforced." § 1446(g); *see In re Pennsylvania*, No. 2:13cv1871, 2013 WL 4193960,

at *11 (E.D. Pa. Aug. 15, 2013) ("By its terms, the statute contemplates that the

same § 1442 proceeding could be removed at more than one juncture."); *Conklin v.*

*Kane*, No. 13–3058, 2014 WL 4411593, at *4 (M.D. Pa. Sept. 5, 2014) (explaining

that the thirty-day removal clock was first triggered when the plaintiff filed a

motion for sanctions against the defendant (a federal judge) and then re-triggered

when the state court later scheduled a hearing on the motion), *aff'd* 634 F. App'x

69, 75 (3d Cir. 2015). The district court in *Conklin* elaborated:

> To the extent § 1446(g) is ambiguous on this point, its legislative
> history reveals the provision was drafted with help from the
> Department of Justice to provide federal officers with multiple
> opportunities to remove a proceeding in which their testimony or
> documents are sought. See H.R.Rep. No. 112–17(I) at 6 (2011). . . .
> The House Report explained that the Justice Department typically
> ignored subpoenas at first, but wanted to maintain its ability to
> "re-trigger" the removal period when it received notice of a party's
> motion to enforce, the point at which the Department could no longer
> ignore the subpoena. *Id.*; *In re Pennsylvania*, 2013 WL 4193960, at
> *11.

*Conklin*, 2014 WL 4411593, at *4.

In *Loftin v. Rush*, 767 F.2d 800 (11th Cir. 1985), in addition to holding that

"the timeliness requirement in § 1446(b) is not binding on the government," *id.* at

805, the Eleventh Circuit recognized that the government may elect to remove a

case at different junctures. In that case, the United States Navy, having failed to

answer a properly served summons of garnishment, removed a state garnishment

proceeding after the state court entered a default judgment against the government.

The Eleventh Circuit found that the case was "properly removed" following entry

of the default judgment but also noted that, had the Navy chosen to seek relief from

the default judgment in state court, and "[h]ad the state courts proven recalcitrant,

and had the judgment stood, the government could then have petitioned for removal

under § 1442(a)(1)." *Id.* at 805–06.

Here, the United States maintains that its notice of removal was timely

because it was filed just two days after the state court "issued" its "judicial order"

directing the release of "documents." According to the United States, it was then

that removal by the United States became "truly necessary." ECF 12 at 48; *see In re*

*Pennsylvania*, 2013 WL 4193960 at *12 ("Congress intended to provide a federal

officer with an opportunity to remove a proceeding *when it would be clear that it*

*needed to take action*, even if it meant "re-set[ting]" the clock to allow for a second

or third chance." (emphasis added)). Plaintiffs, on the other hand, contend that the

Government's reliance on § 1446(g) is misplaced because, in this case, the state

court did not order the *federal government* to release documents but, instead,

ordered FDOT to release documents. Having determined that the United States, on

behalf of the NTSB, is the real party in interest regarding those documents, the

court concludes that the "multiple juncture" procedure set forth in § 1446(g) fits

the removal in this case, the circumstances of which are analogous to the subpoena

proceedings addressed by Congress. *See* H.R. Rep. 112-17(I) at 6. The court thus

declines to remand a case that was removed under § 1442(a)(1) just two days after

the state court "issued" its order requiring the release of documents that were the

subject of an NTSB non-disclosure directive.

In *Loftin*, while noting that the government's removal petition was filed "far

beyond the 30-day time limit established by 28 U.S.C. § 1446(b)," the Eleventh

Circuit refused to order the case remanded "on technical grounds." 767 F.2d at 805.

The circuit court explained: "The timeliness of a removal petition is not

jurisdictional, and we therefore have the power to review even an untimely petition.

Were we to conclude otherwise, we would trivialize our authority under 28 U.S.C. §

1442(a)(1)." *Id.* Because the remedy requested by Plaintiffs in this case necessarily

impacts—indeed seriously interferes with—the NTSB's administrative decisions

and investigative operations, this court would decline to remand the case even *if* the

United States could have or should have removed the case at an earlier date.

Under 28 U.S.C. § 517, the United States, as a non-party, was authorized to

file a statement in the state court lawsuit explaining the interests of the United

States in this case. 28 U.S.C. § 517. By filing such a statement, the United States

did not become a party to the case, did not become an intervenor in the case, did not

waive its sovereign immunity, and did not waive its right to remove the case

pursuant to § 1442(a)(1). There is no time limit set forth in § 517. *Creedle*, 2017

WL 5159602, at *2. If, as Plaintiffs suggest, the United States, as a non-party, is

required to remove a case within thirty days of informally learning that the case

*might* adversely impact the government's interests, then the benefits sought to be

achieved by § 517—including avoidance of "hasty and perhaps unnecessary

removals to busy district courts," ECF 12 at 47—would be rendered moot. This court is confident that Congress did not intend such a result.

Nor is this court convinced that it lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine.[6] That doctrine provides that, among federal courts, only the Supreme Court has the authority to exercise appellate jurisdiction over final state court judgments. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (explaining that *Rooker-Feldman* is a narrow doctrine confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"). The *Rooker-Feldman* doctrine does *not* apply to non-parties—such as the United States here—who are in no position to seek review through the state court system. *Johnson v. DeGrandy*, 512 U.S. 997, 1006 (1994).

Plaintiffs' motion to remand is due to be DENIED.

### III. GOVERNMENT'S MOTION TO QUASH

#### A.

The United States has moved to quash the state court's order and to dismiss

---

[6] *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983).

the case. Plaintiffs oppose the Government's motion, arguing—among other things—that "there is no authority permitting this court to quash a final order from a state court." ECF 9 at 6. The court is not persuaded by Plaintiffs' argument.

The United States removed this case just two days after the state court entered its order directing FDOT to produce the documents at issue. Plaintiffs maintain that this order was a "final judgment," unreviewable by a federal court, because it "fully and finally resolved all of the issues raised in that state court action." ECF 9 at 7. A state judgment is final, however, so as to preclude federal review on removal under § 1442, when it is subject to no further review or correction in a state tribunal. *See. e.g,*, *Oviedo v. Hallbauer*, 655 F.3d 419, 423 (5th Cir. 2011) (recognizing that, for purposes of removal under § 1442(a), a "truly final state court judgment"—one that is *not* subject to review in federal court under § 1442—is one "where the state court judgment [at the time of removal] was no longer subject to modification by the rendering court or subject to further direct appellate review"); *Jackson v. American Sav. Mortg. Corp.*, 924 F.2d 195, 198 n.8, 199 (11th Cir. 1991) (recognizing that, upon removal of a state court's summary judgment order, the federal district court had the authority to consider a motion to modify or vacate the judgment pursuant to Fed. R. Civ. P. 59, where the removing party's opportunities for relief from the state court judgment were not exhausted at

the time of removal; also explaining in a footnote that a removing party's

opportunities for relief in federal court may be "exhausted" when "the time for

relief by motion or appeal has run, leave to appeal has been denied, or the state's

highest court has rendered a judgment"); *Law Office of Mark Kotlarsky Pension

Plan*, 2015 WL 5021399, at *7 (D. Md. Aug. 21, 2015) (granting the government's

"rule 60(b) motion for relief from the state court's judgment and declaring the

judgment void, explaining that, in a case removed after judgment, the district court

adopts the state court judgment and "may review it as it would review its own,

following the ordinary rules regarding post-judgment remedies (internal quotation

marks and alteration omitted)); *Holmes v. AC & S, Inc.*, 388 F. Supp. 2d 663, 673

(E.D. Va. 2004) (concluding that § 1442 "may be used to remove a case after

judgment has been entered in the state court . . . and does not preclude any

applicable post-judgment relief that would be available had this case been initiated

in federal, rather than state, court").

In this case, the Government filed its notice of removal and its motion to

quash the state court's order not only within the thirty-day period permitted under

Florida law to file an appeal, Fla. R. Civ. P. 9.11(b), but also within the fifteen-day

time period permitted under Florida law to file a motion for rehearing, Fla. R. Civ.

P. 1.530(b). Because, at the time of removal (August 23, 2018), the state court still

had the authority to vacate its order of August 21, this court has the authority to

reconsider—and to quash if appropriate—the state court's order.

B.

The United States maintains that the Government is a real party in interest

because the relief requested and obtained by Plaintiffs "interferes with the public

administration." *Dugan*, 372 U.S. at 620. Indeed, because the state court's order

effectively overrules a directive issued by the NTSB, disregards the NTSB's

interpretation of its own regulations, interferes with the NTSB's administrative

decisions regarding the release of investigative information, places FDOT—as a

designated party to the NTSB's investigation—in the position of having to violate

its legal obligation to comply with the NTSB's regulations and directives, and has

the potential to cause harm to the NTSB's congressionally mandated investigation,

the court agrees that the United States is a real party in interest here.

The doctrine of sovereign immunity precludes the United States from being

subject to civil actions unless it has expressly waived its immunity to such actions.

*United States v. Sherwood*, 312 U.S. 584, 586 (1941) ("The United States, as

sovereign, is immune from suit save as it consents to be sued, . . . and the terms of

its consent to be sued in any court define that court's jurisdiction to entertain the

suit."); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver,

sovereign immunity shields the Federal Government and its agencies from suit.");

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949) (noting

that federal officers and agents may also be shielded by sovereign immunity "for

the sovereign can act only through agents and, when the agents' actions are

restrained, the sovereign itself may, through him, be restrained"); *Smith v. Cromer*,

159 F.3d 875, 879 (4th Cir. 1998) ("It is also clear that an action seeking specific

relief against a federal official, acting within the scope of his delegated authority, is

an action against the United States, subject to the governmental privilege of

sovereign immunity.")[7]

The United States has asserted its sovereign immunity in this case, and

Plaintiffs have pointed to no statute that constitutes an applicable and express

-------------------

[7] Although Plaintiffs sued FDOT, a state agency, it bears noting that, as a designated party to the NTSB's investigation, FDOT was obliged to follow the NTSB's directives under valid agency regulations regarding the release of the documents requested by Plaintiffs. As a "party" to the investigation, FDOT acts as an "agent" of the NTSB. As is true when a federal officer is sued, a suit against an "agent" of a federal agency, acting within the scope of his delegated authority, is an action against the United States. *See e.g.*, *Allen v. Allen*, 291 F. Supp. 312, 314 (S.D. Iowa 1968) (action against private contractor, under contract with a federal agency, constituted an action against the United States and was, therefore, subject to the doctrine of sovereign immunity); *Crutchfield v. Sewerage and Water Bd. of New Orleans*, 829 F.3d 379, 375 (5th Cir. 2016) (explaining that the federal officer removal statute "creates federal jurisdiction even over cases brought against private parties [or non-federal entities] if they are sued for conduct they committed under the direction of federal authorities and for which they have a colorable defense under federal law").

waiver of the Government's immunity to suit. Contrary to Plaintiffs' assertions, §

702 of the federal Administrative Procedures Act, 5 U.S.C. § 702, does not

constitute such a waiver. By its plain terms, § 702 applies to actions "in a court of

the United States" and not to actions in a state court. Congress said as much in the

legislative history of the statute. *See* H.R. Rep. No. 94–1656, at 11, *as reprinted in*

1976 U.S.C.C.A.N. 6121, 6131 ("The consent to suit is also limited to claims in

courts of the United States; hence, the United States remains immune from suit in

state courts."). Because the jurisdiction of this court on removal is derivative of the

state court's jurisdiction, it is the Government's sovereign immunity from suit in

state court that matters.

Having determined that Plaintiffs' suit is one against the United States,

whose sovereign immunity has not been waived, the court finds that the state court

lacked jurisdiction to order the FDOT to produce documents that the NSTB,

exercising its valid federal regulatory authority, directed FDOT *not* to produce.

Because the state court lacked jurisdiction over the matter, this court likewise lacks

derivative jurisdiction over the matter. The state court's order is due to quashed and

the case dismissed for lack of jurisdiction.

## C.

In its motion to quash, the Government points to Federal Rule of Civil

Procedure 19 as another ground for dismissal of the case. According to the

Government, the United States is a required party that is unable to be joined

because it enjoys sovereign immunity in state court.[8] Plaintiffs contend that,

"having declined the state court's offer to join the action as a party, it is too late for

the United States to seek dismissal for failure to join an indispensable party." ECF 9

at 8–9. It is not too late. The indispensable-party issue may be raised on appeal and

by the court *sua sponte* at any time. *See, e.g.*, *Boles v. Greeneville Hous. Auth.*, 468

F.2d 476, 479 (6th Cir. 1972) (raising the issue *sua sponte* on appeal). The United

States, moreover, did not waive its right to raise the issue here, in a federal forum,

by "declin[ing] the state court's offer to join the action as a party."

The United States contends—and this court agrees—that the Government

was and is a "required" entity pursuant to Rule 19(a). That rule provides that an

entity is a "required party" if "that [entity] claims an interest relating to the subject

of the action and is so situated that disposing of the action in the [entity's] absence

may . . . as a practical matter impair or impeded the [entity's] ability to protect the

interest." Fed. R. Civ. P. 19(a)(1). The record here makes clear that the United

---

[8] The indispensable-party issue was raised in state court by FDOT. At a hearing on June 4, 2018, the state judge said he thought NTSB was an indispensable party but had not "researched" or "thought through" the "sovereign immunity issues." The state court ultimately avoided the issue—and denied, as moot, FDOT's motion to dismiss for failure to join an indispensable party—by addressing substantive issues regarding the NTSB's regulations and directive.

States, on behalf of the NTSB, has a material interest in this case, the outcome of

which could potentially (1) undermine the validity of the NTSB's non-disclosure

directives issued consistent with the NTSB's interpretation of its relevant

regulations, (2) interfere with the administration and operation of the NTSB's

congressionally mandated investigation; and (3) expose the FDOT to conflicting

orders from two different sovereigns. Because Plaintiffs cannot obtain relief from

FDOT without, at the same time, seriously impacting the interests of the NTSB, this

court finds that the United States, on behalf of the NTSB, is a "required" party

under Rule 19(a).

　　　　Having determined that the United States is a required party, the court must

next consider whether the action should be dismissed "in equity and good

conscience" under Rule 19(b). Rule 19(b) sets out four factors to consider:

> (1) the extent to which a judgment rendered in [the Government's]
> absence might prejudice [the Government] or the existing parties; (2)
> the extent to which any prejudice could be lessened or avoided by (A)
> protective provisions in the judgment, (B) shaping the relief, or (C)
> other measures; (3) whether a judgment rendered in [the
> Government's] absence would be adequate; and (4) whether
> [Plaintiffs] would have an adequate remedy if the action were
> dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

　　　　As to the first factor—"the extent to which a judgment rendered in the

person's absence might prejudice that person or the existing parties"—the Supreme

Court has instructed courts to give strong consideration to the interests of a required party asserting sovereign immunity. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 865–69 (2008). In *Pimentel*, two foreign sovereign entities were among the defendants in a interpleader action filed in federal court. Invoking their sovereign immunity, the two foreign entities were dismissed from the action. In their absence and over their objection, the interpleader action proceeded to judgment. While acknowledging that the two foreign entities were required parties under Rule 19(a), the district court determined that "their claim had so little likelihood of success on the merits that the interpleader action could proceed without them." *Id.* at 860. The court of appeals affirmed. The Supreme Court reversed. Citing two Supreme Court cases involving the intersection of joinder under Rule 19 and the governmental immunity of the United States,[9] the Supreme Court characterized the holdings in the two cases as "clear":

> A case *may not proceed* when a required-entity sovereign is not amenable to suit. These cases instruct us that where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, *dismissal of the action must be ordered* where there is a potential for injury to the interests of the absent sovereign.

---

[9] *Mine Safety Appliances Co. v. Forrestal*, 326 U.S. 371 (1945) (dismissing the action because the government was a required-entity sovereign that did not consent to be sued and could not be joined); *Minnesota v. United States*, 305 U.S. 382 (1939) (dismissing the action for non-joinder where the United States was a required-entity sovereign that had not consented to suit).

*Id.* at 867 (emphasis added). Noting that both the district court and the appellate court "did not accord proper weight to the compelling claim of sovereign immunity," *id.* at 869, the Supreme Court explained:

> [I]t was improper to issue a definitive holding regarding a nonfrivolous, substantive claim made by an absent, required entity that was entitled by its sovereign status to immunity from suit. That privilege is much diminished if an important and consequential ruling affecting the sovereign's substantial interest is determined, or at least assumed, by a federal court in the sovereign's absence and over its objection.

*Id.* at 868–69; *see also id.* at 864 (stating: "The [appellate] court's consideration of the merits was itself an infringement on foreign sovereign immunity."). Although it briefly considered the second, third, and fourth factors set forth in Rule 19(b), the Supreme Court suggested that the first Rule 19(b) factor, with the absent entities' assertion of sovereign immunity, dictated the outcome of the case, namely: "The action may not proceed." *Id.* 864.

Relying on *Pimentel*, the Eleventh Circuit reached a similar conclusion in *Florida Wildlife Federation, Inc. v. United States Army Corps of Engineers*, 859 F.3d 1306 (2017), a case that is instructive here. In *Florida Wildlife*, a case filed in federal court, the plaintiffs sued the Army Corps of Engineers (the "Corps"), alleging that certain decisions made by the Corps negatively affected the quality of certain Florida waters in violation of the Clean Water Act and Florida law. The

Corps moved to dismiss the complaint on the basis of sovereign immunity. The

Florida Department of Environmental Protection ("DEP") and the South Florida

Water Management District (the "Water District"), both agencies of the State of

Florida, were also named as defendants. Independently of the Corps, DEP and the

Water District moved to dismiss the complaint, invoking their Eleventh

Amendment immunity to suit in federal court and arguing that the entire case

should be dismissed under Rule 19. The plaintiffs thereafter voluntarily dismissed

DEP and the Water District. The Water District then filed a motion for limited

intervention, reasserting its Rule 19 argument for dismissal of the entire case. While

denying the Water District's motion to intervene, the district court permitted the

Water District to participate in the case as amicus curiae to present its Rule 19

arguments. The district court ultimately granted the Corps' motion to dismiss the

case on federal sovereign immunity grounds and, "[i]n effect, declined to grant the

Water District's request to consider first (before evaluating the Corps's sovereign-

immunity argument) the Water District's procedural argument under Federal Rule

of Civil Procedure 19(b)." *Id.* at 1316.

On appeal, the Eleventh Circuit acknowledged that it "must give strong

consideration to the Water District's interest in this case because the Water District

is a sovereign entity to which we owe comity." *Id.* at 1318. Citing *Pimentel*, 553

U.S. at 864–65, the Eleventh Circuit wrote: "In Rule 19(b) cases where a required party asserts sovereign immunity, the Supreme Court has instructed us to give sufficient weight to the party's sovereign status out of recognition that any consideration of the merits in the sovereign's absence is itself an infringement on sovereign immunity." *Florida Wildlife*, 859 F.3d at 1318. Taking its "cue" from the *Pimentel* Court, the Eleventh Circuit explained that it had "no choice but to conclude that the Water District is, in fact, 'indispensable' to this litigation." *Id.* In conclusion, the Eleventh Circuit wrote:

> The Water District is entitled to and has invoked sovereign immunity, and we cannot ignore that it could suffer significant cognizable injury to its interests if the litigation here proceeds without it. We can appreciate the district court's equitable concern that "[t]he [Water] District cannot eat its cake and have it, too. . . . The [Water] District can come aboard or not as it chooses, but it cannot have it both ways." But we think *Pimentel* requires us, at least in this situation, to reach the opposite conclusion. Because the Water District is an indispensable but absent sovereign, the action must be dismissed under Rule 19(b).

*Id.* at 1320.

The court reaches the same result here. The United States, on behalf of the NTSB, is a required-entity sovereign that claims it could suffer serious harm to its substantial federal interests if the case proceeds in its absence. Like the claims of sovereign immunity in *Pimentel* and *Florida Wildlife*, the Government's claim of sovereign immunity is compelling and more than sufficient to satisfy the first Rule

19(b) factor—"the extent to which a judgment rendered in the person's absence

might prejudice that person or the existing parties." Fed. R. Civ. P. 19(b)(1). The

first factor suggests that dismissal is required.

The remaining three factors confirm the outcome suggested by the first

factor. The second factor ("the extent to which any prejudice could be lessened or

avoided"), Fed. R. Civ. P. (19(b)(2), favors the United States: Given the relief

sought by Plaintiffs, there are no alternative forms of relief that could either lessen

or avoid prejudice to the United States. The Supreme Court has explained that

"adequacy" as used in the third factor ("whether a judgment rendered in the

person's absence would be adequate"), Fed. R. Civ. P. 19(b)(3), refers to the

"public stake in settling disputes by wholes, whenever possible." *Pimentel*, 553

U.S. at 870 (internal quotation marks omitted). Ordinarily, this factor takes into

account additional litigation that might be initiated by an absent party who is not

bound by the judgment. While it is unclear whether such additional litigation can be

anticipated here, it is not difficult to imagine that, if Plaintiffs obtain the relief they

are seeking, the same or other litigants may also seek the release of NTSB-protected

documents from the same or other parties to an NTSB investigation. The public

interest would not be served by having additional litigation interrupting and

interfering with the NTSB's investigative work. In addition, as the Government

points out, FDOT may not find the judgment adequate, for it would require FDOT

to violate an NTSB directive that FDOT is obliged to obey. The third factor also

favors the United States.

As to the fourth factor ("whether the plaintiff would have an adequate

remedy if the action were dismissed for nonjoinder"), Fed. R. Civ. P. 19(b)(4), there

is an alternative administrative remedy available that may or may not be

adequate—namely, Plaintiffs may request the documents from the NTSB directly.

49 C.F.R. §§ 837.1–837.4. Assuming, for the sake of argument, that seeking the

documents from the NTSB directly would be futile, the prejudice to the sovereign

United States outweighs any prejudice to Plaintiffs in this regard. *See Pimentel*, 553

U.S. at 872 (recognizing that "[d]ismissal under Rule 19(b) will mean, in some

instances, that plaintiffs will be left without a forum for definitive resolution of their

claims"). At worst, Plaintiffs may have to wait longer than they want for release of

the requested documents, but released they ultimately will be. *See Caves v.*

*Beechcraft Corp.*, No. 15cv125–CVE/PJC, 2016 WL 355491, at *5 (N.D. Okla. Jan.

29, 2016) (refusing to compel production of documents from a party to an NTSB

investigation because the requested documents were not approved for release by the

NTSB, and suggesting that "there is nothing prohibiting Plaintiff from requesting

those records from the NTSB directly, as outlined by 49 C.F.R. §§ 837.1–837.4").

Having considered the four Rule 19 factors, and most particularly the first factor, the court finds that the United States is a required entity that, because of its sovereign immunity, cannot be joined and whose presence in the case is indispensable. Under *Pimentel* and *Florida Wildlife*, dismissal is required. The court is not convinced otherwise by the fact that counsel for the United States filed a Statement of Interest in the case and appeared at a hearing to state the Government's position. Indeed, a similar situation arose in *Florida Wildlife*. In that case, the district court allowed the sovereign state entity to present its arguments as amicus curiae, yet dismissal under Rule 19 was nonetheless the outcome. In *Two Shields v. Wilkinson*, 790 F.3d 791 (8th Cir. 2015), the United States was able to file an amicus brief explaining its interests in the subject matter of the action. *Id.* at 795. Moreover, the plaintiffs in that case argued that any prejudice to the government's interests was lessened because the government was free to intervene. *Id.* at 799. The Eighth Circuit responded to the plaintiffs' argument as follows:

> Rule 19(b) requires a court to examine whether a case can proceed "in equity and good conscience" if joinder is not feasible, Fed.R.Civ.P. 19(b), but it does not address the hypothetical intervention of an immune party which is not subject to joinder. The United States enjoys sovereign immunity for appellants' claims and can decide itself when and where it wants to intervene.

*Id.* The Eighth Circuit affirmed the district court's dismissal of the case pursuant to Rule 19. *Id.*

## IV. CONCLUSION

For the reasons explained above, it is ORDERED:

1. Plaintiff's motion to remand (ECF 8) is DENIED.

2. The Government's motion to quash (ECF 7) is GRANTED. The state court's order dated August 21, 2018, (ECF 2–31), is declared void for lack of jurisdiction and is QUASHED.

3. Plaintiffs' complaint and this action are DISMISSED with prejudice.

4. The clerk shall enter judgment stating: "All claims are dismissed with prejudice."

DONE AND ORDERED this ___5th___ day of ___October___, 2018.


s/ William Stafford_____
WILLIAM STAFFORD
SENIOR UNITED STATES DISTRICT JUDGE